### In re PROPOSED INITIATIVE BINGO–RAFFLE LICENSEES (I)

**Mark W. Meyer, A Registered Elector of the State of Colorado, Petitioner,**

and

**Larry Carroll and Charles P. Smith, Respondents,**

and

**Victoria Buckley, Stephen Erkenbrack, and Rebecca Lennahan, Title Setting Board.**

### In re PROPOSED INITIATIVE BINGO–RAFFLE LICENSEES (II)

**Mark W. Meyer, A Registered Elector of the State of Colorado, Petitioner,**

and

**Larry Carroll and Charles P. Smith, Respondents,**

and

**Victoria Buckley, Stephen Erkenbrack, and Rebecca Lennahan, Title Setting Board.**

**Nos. 95SA375, 95SA376.**

Supreme Court of Colorado, En Banc.

April 29, 1996.

Gale A. Norton, Attorney General, Stephen K. ErkenBrack, Chief Deputy Attorney General, Timothy M. Tymkovich, Solicitor General, Maurice G. Knaizer, Deputy Attorney General, Denver, for Title Board.

Isaacson, Rosenbaum, Woods & Levy, P.C., Joseph Cachey, III, John G. Spiegleman, Denver, for Petitioner.

Carroll & Associates, P.C., Larry Carroll, Lynn J. Ellins, of Counsel, Denver, for Respondents.

Justice KIRSHBAUM delivered the Opinion of the Court.

Pursuant to section 1–40–107(2), 1B C.R.S. (1995 Supp.), petitioner Mark W. Meyer (the objector) has filed petitions to review the actions of the initiative title setting board (the Board) in setting the title, ballot title and submission clause, and summary for two proposed amendments to article XVIII, section 2, of the Colorado Constitution, designated "Proposed Initiative on Bingo–Raffle Licensees (I)" (Initiative I) and "Proposed Initiative on Bingo–Raffle Licensees (II)" (Initiative II).[1] The Initiatives were proposed by respondents Larry Carroll and Charles P. Smith (the proponents), and contain provisions relating to gaming activities conducted by nonprofit organizations. The Initiatives propose identical amendments except that Initiative II does not propose amending the language of subsection (2) of article XVIII, section 2, of the Colorado Constitution relating to bingo-raffle license requirements and expiration dates. Because of the similarity of the Initiatives, we combine our decisions in a single opinion. The text of Initiative I is attached hereto as APPENDIX A. The texts of the title, ballot title and submission clause, and summary prepared by the Board for Initiative I are attached hereto as APPENDIX B. The text of Initiative II is attached hereto as APPENDIX C. The texts of the title, ballot title and submission clause, and summary prepared by the Board for Initiative II are attached hereto as APPENDIX D.

The objector argues that the Initiatives impermissibly encompass multiple, unrelated subjects. In addition, the objector contends that the title, ballot title and submission clause, and summary set for each Initiative fail to correctly and fairly express the true intent and meaning of the respective Initiatives and would therefore confuse and mis-lead the public. We approve the action of the Board with respect to each Initiative.

I

On October 19, 1995, the proponents submitted the Initiatives to the Colorado Secretary of State. In early November 1995, the Board set a title, ballot title and submission clause, and summary for each Initiative. On November 8, 1995, the objector filed motions for rehearing pursuant to section 1–40–107(1), 1B C.R.S. (1995 Supp.), alleging that the Initiatives did not conform to the single-subject requirement of article V, section 1(5.5), of the Colorado Constitution and that the title, ballot title and submission clause, and summary of each Initiative were misleading and did not correctly and fairly reflect the true intent and meaning of the respective Initiatives. On November 15, 1995, after a hearing, the Board denied the motions for rehearing. Petitions to review the actions of the Board were filed with this court on November 20, 1995.

II

Article V, section 1, of the Colorado Constitution reserves to the registered electors of the State of Colorado the right to initiate constitutional amendments. Article V, section 1(5.5), of the Colorado Constitution, a referred amendment approved by the electorate in the 1994 general election, contains the following pertinent provisions concerning the content of proposed measures:

(5.5) No measure shall be proposed by petition containing more than one subject, which shall be clearly expressed in its title; but if any subject shall be embraced in any measure which shall not be expressed in the title, such measure shall be void only as to so much thereof as shall not be so expressed. If a measure contains more than one subject, such that a ballot title cannot be fixed that clearly expresses a single subject, no title shall be set and the measure shall not be submitted to the people for adoption or rejection at the polls . . . .

---

1. Initiatives I and II shall collectively be referred to as the "Initiatives."

Colo. Const. art. V, § 1(5.5); *see* Senate Concurrent Resolution 93-4, 1993 Colo. Sess. Laws 2152. In 1994, the General Assembly enacted section 1-40-106.5, 1B C.R.S. (1994 Supp.), to implement the single-subject requirement. *See* Ch. 22, sec. 1, § 1-40-106.5, 1994 Colo. Sess. Laws 73. That statute contains the following pertinent provisions:

**Single-subject requirements for initiated measures and referred constitutional amendments—legislative declaration.**
(1) The general assembly hereby finds, determines, and declares that:

(a) Section 1(5.5) of article V and section 2(3) of article XIX of the state constitution require that every constitutional amendment or law proposed by initiative and every constitutional amendment proposed by the general assembly be limited to a single subject, which shall be clearly expressed in its title.

(b) Such provisions were referred by the general assembly to the people for their approval at the 1994 general election pursuant to Senate Concurrent Resolution 93-4.

(c) The language of such provisions was drawn from section 21 of article V of the state constitution, which requires that every bill, except general appropriation bills, shall be limited to a single subject, which shall be clearly expressed in its title.

(d) The Colorado supreme court has held that the constitutional single-subject requirement for bills was designed to prevent or inhibit various inappropriate or misleading practices that might otherwise occur, and the intent of the general assembly in referring to the people section 1(5.5) of article V and section 2(3) of article XIX was to protect initiated measures and referred constitutional amendments from similar practices.

(e) The practices intended by the general assembly to be inhibited by section 1(5.5) of article V and section 2(3) of article XIX are as follows:

(I) To forbid the treatment of incongruous subjects in the same measure, especially the practice of putting together in one measure subjects having no necessary or proper connection, for the purpose of enlisting in support of the measure the advocates of each measure, and thus securing the enactment of measures that could not be carried upon their merits;

(II) To prevent surreptitious measures and apprise the people of the subject of each measure by the title, that is, to prevent surprise and fraud from being practiced upon voters.

(2) It is the intent of the general assembly that section 1(5.5) of article V and section 2(3) of article XIX be liberally construed, so as to avert the practices against which they are aimed and, at the same time, to preserve and protect the right of initiative and referendum.

(3) It is further the intent of the general assembly that, in setting titles pursuant to section 1(5.5) of article V, the initiative title setting review board created in section 1-40-106 should apply judicial decisions construing the constitutional single-subject requirement for bills and should follow the same rules employed by the general assembly in considering titles for bills.

§ 1-40-106.5, 1B C.R.S. (1995 Supp.). The single-subject requirement is designed to protect voters against fraud and surprise and to eliminate the practice of combining several unrelated subjects in a single measure for the purpose of enlisting support from advocates of each subject and thus securing the enactment of measures which might not otherwise be approved by voters on the basis of the merits of those discrete measures. *In re Proposed Initiative for an Amendment to the Constitution of the State of Colorado Adding Section 2 to Article VII (Petitions),* 907 P.2d 586, 589 (Colo.1995) (*In re Petitions*); *In re Proposed Initiative "Public Rights in Waters II",* 898 P.2d 1076, 1078 (Colo.1995) (*In re Public Rights in Waters II*); *In re Proposed Initiative on Sch. Pilot Program,* 874 P.2d 1066, 1069 (Colo.1994) (*In re Sch. Pilot Program*).

In order to aid electors in seeking to exercise the right to initiate constitutional amendments, the Board has the duty to designate and fix a title, ballot title and submission clause, and summary for initiated petitions before they are signed by electors. *In re Petitions,* 907 P.2d at 589; *In re Sch. Pilot*

*Program,* 874 P.2d at 1069. The purpose of the title setting process is to ensure that persons reviewing the initiative petition and voters are fairly advised of the import of the proposed amendment. *In re Petitions,* 907 P.2d at 589–90; *In re Sch. Pilot Program,* 874 P.2d at 1070.

▇▇▇ The title and ballot title and submission clause of a proposed constitutional amendment must fairly express the true intent and meaning of the amendment. § 1–40–106(3)(b), 1B C.R.S. (1995 Supp.). The title must consist of a brief statement accurately reflecting the meaning of the proposed initiative. *In re Petitions,* 907 P.2d at 590; *In re Sch. Pilot Program,* 874 P.2d at 1069. The Board is not required to describe every feature of a proposal in the title and ballot title and submission clause. *In re Petitions,* 907 P.2d at 590; *In re Proposed Initiated Constitutional Amendment Concerning Limited Gaming in the City of Antonito,* 873 P.2d 733, 739 (Colo.1994). However, the Board must "consider the public confusion that might be caused by misleading titles and shall, whenever practicable, avoid titles for which the general understanding of the effect of a 'yes' or 'no' vote will be unclear." *In re Petitions,* 907 P.2d at 590; *In re Proposed Initiated Constitutional Amendment Concerning Limited Gaming in the City of Antonito,* 873 P.2d at 739; *In re Sch. Pilot Program,* 874 P.2d at 1069. The Board must also prepare an impartial summary of the proposed amendment, one not likely to create prejudice either for or against the proposal. § 1–40–106(3)(a), 1B C.R.S. (1995 Supp.).

▇▇▇ A proponent of an initiated measure or any registered elector who believes a title, ballot title and submission clause, or summary fixed by the Board does not fairly express the true intent of the proposal may file a motion with the Board for a rehearing on the matter and, if such motion is denied, may request review of the Board's action by this court. § 1–40–107(2), 1B C.R.S. (1995 Supp.); *In re Petitions,* 907 P.2d at 590; *In re Sch. Pilot Program,* 874 P.2d at 1070. The scope of our review of action taken by the Board is limited to ensuring that "the title, ballot title and submission clause, and summary fairly reflect the proposed initiative

so that petition signers and voters will not be misled into support for or against a proposition by reason of the words employed by the Board." *In re Petitions,* 907 P.2d at 590; *In re Sch. Pilot Program,* 874 P.2d at 1070 (citations omitted). In conducting such review we will engage in all legitimate presumptions in favor of the propriety of the Board's actions. *In re Petitions,* 907 P.2d at 590; *In re Proposed Initiative "Auto. Ins. Coverage",* 877 P.2d 853, 856 (Colo.1994).

## III

### A

The objector contends that the Initiatives do not contain a single subject and therefore violate article V, section 1(5.5), of the Colorado Constitution. We disagree.

▇▇▇ A proposed measure impermissibly includes more than one subject if its text relates to more than one subject and if the measure has at least two distinct and separate purposes which are not dependent upon or connected with each other. *In re Petitions,* 907 P.2d at 590; *In re Public Rights in Waters II,* 898 P.2d at 1078–79; *see People v. Sours,* 31 Colo. 369, 405, 74 P. 167, 178 (1903) (interpreting single-subject requirement for bills).

▇▇▇ In our view, the texts of the Initiatives encompass the single subject of gaming activities conducted by nonprofit organizations. The Initiatives detail what games of chance may be conducted, who may conduct such games, and how such games may be conducted. For example, Initiative I decreases the number of years a nonprofit organization must be in continuous existence to qualify for a license to conduct authorized games of chance and provides that a bingo-raffle license expires on the anniversary date of issuance. Both Initiatives authorize electronic versions of games of chance presently permitted to be conducted, authorize certain nonprofit organizations to conduct electronic versions of games of chance with specific limitations, and authorize the General Assembly to provide that authorized games of chance may be managed and operated by persons who are not members of the licensed

nonprofit organizations conducting such games and that members or nonmembers managing or operating such games may be remunerated for their services.

None of the provisions of either Initiative relates to a subject other than gaming activities conducted by nonprofit organizations. Thus, the single purpose of each Initiative is to address current restrictions imposed on nonprofit organizations desiring to conduct gaming activities. Unlike other proposed initiatives which we have determined violated the single-subject requirement, these Initiatives do not attempt to further two or more unconnected purposes. *See In re Proposed Petition for an Amendment to the Constitution of the State of Colorado Adding Subsection (10) to Section 20 of Article X (Amend Tabor 25),* 900 P.2d 121, 125 (Colo.1995) (tax credit and procedural requirements for future ballot titles were two unconnected purposes) (*In re Tabor 25* ); *In re Public Rights in Water II,* 898 P.2d at 1080 (election and boundary rules for water conservancy and conservation districts and effective enforcement and development of a "strong public trust" doctrine were two unrelated purposes); *In re House Bill No. 1353,* 738 P.2d 371, 372–73 (Colo.1987) (forty-four page bill violated single-subject requirement where bill covered such disparate topics as reduction of state contributions to employees' retirement funds to charging department of corrections inmates' accounts for medical visits).

Our conclusion is supported by our decision in *In re Petitions,* 907 P.2d 586 (Colo. 1995), in which we determined that a proposed initiative regarding the subject of petitions, including both initiated and referred petitions, did not violate the single-subject requirement despite its comprehensive coverage of issues arising under the subject of petitions. *Id.* at 590–91. In that case the proposed initiative contained numerous pro-

visions, as the following language of our opinion notes:

> The Initiative defines the right to petition and establishes a battery of procedures which govern the exercise of that right. Those provisions include, among other things, various time limitations; guidelines for formatting and filing petitions; procedures for challenging ballot titles and petitions on single-subject grounds; and rules regarding printing, distribution, and format of petition forms. The Initiative prohibits limitation of peaceful petitioning on public, district-owned property; limits the number of legislative measures which may be excepted from referendum petitions; describes certain procedures related to the exception process; and provides guidelines for distribution to voters of information regarding petitions. It also defines certain terms used in the Initiative, expresses general guidelines for interpretation of petitions, and authorizes lawsuits as a remedy for violations of the proposed provisions. The provisions regarding lawsuits authorize recovery of court costs and attorney fees by successful plaintiffs and by defendants who establish that lawsuits are frivolous.

*Id.* at 591. Despite the comprehensive nature of the initiative, we determined that its numerous provisions related to the single purpose of reforming petition rights and procedures and did not violate the single-subject requirement. *Id.*

The provisions of each Initiative in this case relate to the single purpose of revising restrictions on gaming activities conducted by nonprofit organizations. The Initiatives do not combine unrelated, incongruous subjects in an effort to defraud the public and cause voters to inadvertently adopt measures they do not support in the process of voting for measures they do support. *See* § 1–40–106.5(e)(I), (II), 1B C.R.S. (1995 Supp.).[2]

---

**2.** A proposed initiative will not satisfy the single-subject requirement merely because its provisions can be described under a broad concept which potentially misleads voters because the concept tends to obscure significantly different subjects. *See In re Tabor 25,* 900 P.2d at 125 (rejecting argument that tax credit and ballot title procedural requirements united by common

characteristic of "government revenue changes"); *In re Public Rights in Water II,* 898 P.2d at 1080 (rejecting argument that water conservancy and water conservation district elections provisions and "public trust" doctrine provision united by common characteristic of "water").

## B

The objector contends that even if the Initiatives contain a single subject, the title, ballot title and submission clause, and summary of each Initiative do not correctly and fairly reflect the true intent and meaning of the proposal. We again disagree.

 The title, ballot title and submission clause, and summary of each Initiative indicate that the Initiative addresses issues relevant to gaming conducted by nonprofit organizations and highlight numerous important features of the Initiative. The objector offers four examples of deficiencies in the title, ballot title and submission clause, and summary of each Initiative. We find these unpersuasive.

The objector argues that the title, ballot title and submission clause, and summary of each Initiative which indicate that licensees may use "electronic, computerized, or other technologic devices to play games of chance or simulate the playing of games of chance, but not including slot machines that have a drum or reel with insignia as an essential part which dispense cash," do not reveal, for instance, whether the Initiatives permit electronic versions of slot machines which do not have a drum or reel. With respect to this example, we note that the Board used language substantially similar to the language contained in the Initiatives. Thus the titles, ballot title and submission clauses, and summaries do not inaccurately describe the provisions of the Initiatives. In reviewing the Board's actions, we do not interpret the language of the proposed initiative or predict its application if adopted by the electorate. *In re Petitions,* 907 P.2d at 590; *In re Petition on Campaign and Political Fin.,* 877 P.2d 311, 313 (Colo.1994).[3]

The objector contends that the title, ballot title and submission clause, and summary of each Initiative do not disclose important features of the Initiative. In particular, the objector contends that the title and ballot title and submission clause do not disclose that the Initiatives authorize games to be conducted at unlicensed facilities and that the Initiatives establish a $2.00 wager limit with respect to games authorized under subsection (4)(e) of the Initiatives but do not expressly establish a wager limit with respect to games authorized under subsections (3) and (4)(d) of the Initiatives.

The title, ballot title and submission clause, and summary of each Initiative indicate that the Initiative "chang[es] limitations on where games of chance may be conducted." The Initiative provides that authorized games may be conducted "at a licensed commercial bingo facility, on premises owned by or in sole control of a bingo-raffle licensee, or at such other location as approved by the Secretary of State." To the extent that this provision changes current law, the title, ballot title and submission clause, and summary accurately reflect that fact. The Board is not required in setting the title, ballot title and submission clause to speculate as to the types of locations which may be approved for gaming activities pursuant to this provision.

With respect to the $2.00 wager limit provision, the Board is not required to describe every feature of a proposed measure in the title, ballot title and submission clause, and summary unless such feature is central to the measure. We note, however, that the Board has in fact indicated in the summary of each Initiative that the Initiative establishes a $2.00 wager limit on games authorized under subsection (4)(e) of the Initiative. With respect to the fact that the Initiatives do not establish a wager limit in connection with games authorized under subsections (3) and (4)(d) of the Initiatives, the Board is not required to describe in the titles, ballot title and submission clauses, and summaries issues not addressed by the Initiatives.

The objector argues that the statement "but not including slot machines that have a drum or reel with insignia as an essential part which dispense cash," is misleading in that it suggests that the Initiatives only prohibit machines which have a drum or reel *and* which dispense cash rather than machines which have either feature. To the

---

3. We likewise do not address the objector's contention that the Initiatives are misleading in the manner they distinguish between games of chance permissible under subsection (3) of the Initiatives and games of chance permissible under subsection (4)(e) of the Initiatives.

extent that this statement is not clear in the title and ballot title and submission clause of each Initiative, the summary of each Initiative clearly discloses that the Initiatives prohibit machines that employ either feature. Therefore, on balance the title, ballot title and submission clause, and summary of each Initiative accurately reflect the provisions of the respective Initiatives.

### IV

For the foregoing reasons, we approve the Board's action with respect to each Initiative.

### APPENDIX A

Be it Enacted by the People of the State of Colorado:

Article XVIII, Section 2, of the constitution of the state of Colorado is amended to read:

**Section 2. Lotteries prohibited—exceptions.** (1) The general assembly shall have no power to authorize lotteries for any purpose; except that the conducting of such games of chance as provided in subsections (2) to (4) of this section shall be lawful on and after January 1, 1959, and the conducting of state-supervised lotteries pursuant to subsection (7) of this section shall be lawful on and after January 1, 1981.

(2) No game of chance pursuant to this subsection (2) and subsections (3) and (4) of this section shall be conducted by any person, firm, or organization, unless a bingo-raffle license as provided for in this subsection (2) has been issued to the firm or organization conducting such games of chance. The secretary of state shall, upon application therefor on such forms as shall be prescribed by the secretary of state and upon the payment of an annual fee as determined by the general assembly, issue a bingo-raffle license for the conducting of such games of chance to any bona fide chartered branch or lodge or chapter of a national or state organization or to any bona fide religious, charitable, labor, fraternal, educational, voluntary firemen's or veterans' organization which operates without profit to its members and which has been in existence continuously for a period of three years immediately prior to the making of said application for such bingo-raffle license and has had during the entire three year period a dues-paying membership engaged in carrying out the objects of said corporation or organization, such bingo-raffle license to expire at the end of each year on the anniversary date of the date it was issued.

(3) Subject to the restrictions set forth in subsection (4) of this section, the bingo-raffle license issued by the secretary of state shall authorize and permit the bingo-raffle licensee to conduct games of chance, restricted to the selling of rights to participate and the awarding of prizes in bingo and other lotto-based games of chance, in which prizes are awarded on the basis of designated numbers or symbols on a card or sheet of paper conforming to numbers or symbols selected at random, and in the specific game of chance commonly known as raffles, conducted by the drawing of prizes or by the allotment of prizes by chance. A bingo-raffle licensee may also conduct such games of chance on an electronic, computerized, or technologic device that assists in the playing thereof, and conduct facsimiles of such games of chance in which the numbers or symbols are randomly selected or generated and displayed, by an electronic, computerized or other technologic device.

(4) Such games of chance shall be subject to the following restrictions:

(a) The entire net proceeds of any game shall be exclusively devoted to the lawful purposes of organizations licensed to conduct such games.

(b) No person except a bona fide member of any bingo-raffle licensee may participate in the management or operation of any such game except as may be provided by the general assembly.

(c) No person may receive any remuneration or profit for participating in the management or operation of any such game except as may be provided by the general assembly.

(d) Except as provided for in paragraph (e) of this subsection, only the lotto-based games of chance known as bingo, pull tabs and raffles may be conducted by a bingo-raffle licensee at a licensed commercial bingo facility, on premises owned by or in sole

control of a bingo-raffle licensee, or at such other location as approved by the secretary of state. If an electronic, computerized or other technologic device is used to assist in the playing of such games of chance, or to conduct facsimiles thereof, the device may not dispense cash.

(e) In addition, a bingo-raffle licensed fraternal, veterans', or labor organization may also conduct other lotto-based games of chance on private premises owned by or in sole control of such licensee, but only when an electronic, computerized or technologic device is used in the conduct of such other lotto-based game of chance, the playing of such device is limited to members of the bingo-raffle licensee and their bona fide guests all of whom are at least twenty one years of age, the device does not permit the conduct of the lotto-based games of chance commonly known as a slot machine in which a drum or reel with insignia is an essential part, craps, or roulette, the device does not dispense cash, and no single wager exceeds two dollars.

(f) The number of electronic, computerized or technologic devices used in the conduct of such other lotto-based games of chance conducted by a bingo-raffle licensed fraternal, veterans', or labor organization shall be determined by the general assembly. No device shall be licensed for an auxiliary or adjunct group of any such bingo-raffle licensee.

(g) Any electronic, computerized or technologic device used in the conduct of any lotto-based games of chance may be owned or leased by the bingo-raffle licensee or licensed commercial bingo facility and such licensees may also enter into service maintenance agreements. Compensation for said lease or maintenance agreements may be based on a percentage of the proceeds remaining after payments to players, or upon such other terms and conditions as to which the parties agree.

(5) The general assembly shall enact such laws as are necessary to implement the provisions of this section as adopted at the 1996 general election, and until the effective date of such laws, which shall not be later than July 1, 1997, the current provisions of this section, any statute enacted thereunder, or rule promulgated pursuant thereto, shall remain in full force and effect, and any pending investigation into an alleged violation of statute or rule, administrative hearing, or judicial proceeding, shall be determined pursuant to then applicable law.

(6) In addition to the licensing of bingo-raffle licensees, the secretary of state shall be responsible for licensing commercial bingo facilities, manufacturers and suppliers of equipment and supplies used in bingo, raffles, and other lotto based games of chance, and such other persons as directed by the general assembly. The secretary of state shall also be responsible for the enforcement of subsections (2) through (4) of this section.

(7) Any provision of this constitution to the contrary notwithstanding, the general assembly may establish a state-supervised lottery. Unless otherwise provided by statute, all proceeds from the lottery, after deduction of prizes and expenses, shall be allocated to the conservation trust fund of the state for distribution to municipalities and counties for park, recreation, and open space purposes.

## APPENDIX B

### Proposed Initiative on "Bingo—Raffle Licensees (I)"

The title as designated and fixed by the Board is as follows:

AN AMENDMENT TO THE COLORADO CONSTITUTION CONCERNING GAMES OF CHANCE CONDUCTED BY A BONA FIDE CHARITABLE OR NONPROFIT ORGANIZATION, AND, IN CONNECTION THEREWITH, REDUCING THE LENGTH OF TIME AN ORGANIZATION MUST HAVE EXISTED TO QUALIFY FOR A BINGO–RAFFLE LICENSE FROM FIVE YEARS TO THREE YEARS; EXPANDING THE VARIETY OF GAMES PERMITTED; ALLOWING THE USE OF ELECTRONIC, COMPUTERIZED, OR OTHER TECHNOLOGIC DEVICES TO PLAY GAMES OF CHANCE OR SIMULATE THE PLAYING OF GAMES OF CHANCE, BUT NOT INCLUDING SLOT

MACHINES THAT HAVE A DRUM OR REEL WITH INSIGNIA AS AN ESSENTIAL PART WHICH DISPENSE CASH; ALLOWING THE GENERAL ASSEMBLY TO MAKE EXCEPTIONS TO THE CURRENT PROHIBITION ON THE CONDUCT OF GAMES OF CHANCE BY PERSONS NOT BONA FIDE MEMBERS OF THE LICENSED ORGANIZATION; ALLOWING THE GENERAL ASSEMBLY TO MAKE EXCEPTIONS TO THE CURRENT PROHIBITION ON THE CONDUCT OF GAMES OF CHANCE BY PERSONS WHO RECEIVE REMUNERATION OR PROFIT FOR MANAGING OR OPERATING SUCH GAMES; CHANGING LIMITATIONS ON WHERE GAMES OF CHANCE MAY BE CONDUCTED; ALLOWING LICENSEES TO OWN OR LEASE DEVICES USED TO PLAY GAMES OF CHANCE AND TO BASE THEIR PAYMENTS UNDER LEASES OR MAINTENANCE AGREEMENTS ON A PERCENTAGE OF PROCEEDS; EMPOWERING THE SECRETARY OF STATE TO LICENSE COMMERCIAL BINGO FACILITIES, MANUFACTURERS AND SUPPLIERS OF EQUIPMENT AND SUPPLIES USED IN GAMES OF CHANCE, AND OTHER PERSONS AS DIRECTED BY THE GENERAL ASSEMBLY; MAKING THE SECRETARY OF STATE RESPONSIBLE FOR ENFORCEMENT OF ALL REGULATION OF GAMES OF CHANCE UNDER ARTICLE XVIII, SECTION 2 OF THE STATE CONSTITUTION; AND REQUIRING THE ENACTMENT OF ALL NECESSARY LAWS BY JULY 1, 1997.

The ballot title and submission clause as designated and fixed by the Board is as follows:

SHALL THERE BE AN AMENDMENT TO THE COLORADO CONSTITUTION CONCERNING GAMES OF CHANCE CONDUCTED BY A BONA FIDE CHARITABLE OR NONPROFIT ORGANIZATION, AND, IN CONNECTION THEREWITH, REDUCING THE LENGTH OF TIME AN ORGANIZATION MUST HAVE EXISTED TO QUALIFY FOR A BINGO–RAFFLE LICENSE FROM FIVE YEARS TO THREE YEARS; EXPANDING THE VARIETY OF GAMES PERMITTED; ALLOWING THE USE OF ELECTRONIC, COMPUTERIZED, OR OTHER TECHNOLOGIC DEVICES TO PLAY GAMES OF CHANCE OR SIMULATE THE PLAYING OF GAMES OF CHANCE, BUT NOT INCLUDING SLOT MACHINES THAT HAVE A DRUM OR REEL WITH INSIGNIA AS AN ESSENTIAL PART WHICH DISPENSE CASH; ALLOWING THE GENERAL ASSEMBLY TO MAKE EXCEPTIONS TO THE CURRENT PROHIBITION ON THE CONDUCT OF GAMES OF CHANCE BY PERSONS NOT BONA FIDE MEMBERS OF THE LICENSED ORGANIZATION; ALLOWING THE GENERAL ASSEMBLY TO MAKE EXCEPTIONS TO THE CURRENT PROHIBITION ON THE CONDUCT OF GAMES OF CHANCE BY PERSONS WHO RECEIVE REMUNERATION OR PROFIT FOR MANAGING OR OPERATING SUCH GAMES; CHANGING LIMITATIONS ON WHERE GAMES OF CHANCE MAY BE CONDUCTED; ALLOWING LICENSEES TO OWN OR LEASE DEVICES USED TO PLAY GAMES OF CHANCE AND TO BASE THEIR PAYMENTS UNDER LEASES OR MAINTENANCE AGREEMENTS ON A PERCENTAGE OF PROCEEDS; EMPOWERING THE SECRETARY OF STATE TO LICENSE COMMERCIAL BINGO FACILITIES, MANUFACTURERS AND SUPPLIERS OF EQUIPMENT AND SUPPLIES USED IN GAMES OF CHANCE, AND OTHER PERSONS AS DIRECTED BY THE GENERAL ASSEMBLY; MAKING THE SECRETARY OF STATE RESPONSIBLE FOR ENFORCEMENT OF ALL REGULATION OF GAMES OF CHANCE UNDER ARTICLE XVIII, SECTION 2 OF THE STATE CONSTITUTION; AND REQUIRING THE ENACTMENT OF ALL NECESSARY LAWS BY JULY 1, 1997?

The summary prepared by the Board is as follows:

This proposal reduces from five years to three years the length of time an organization must have existed to qualify for a bingo-

raffle license. In addition, the measure specifies that a bingo-raffle license expires on the anniversary date of its issuance rather than at the end of the calendar year.

The proposal also expands the variety of allowable games to include any "lotto-based game of chance," including lotto, bingo, pull tabs, and raffles. It allows the use of "electronic, computerized, or other technologic devices" to play games of chance or simulate the playing of games of chance through the use of randomly selected or generated numbers or symbols, but not including slot machines that have a drum or reel with insignia as an essential part which dispense cash. Where games are conducted on premises not owned by or in the sole control of a licensed fraternal, veterans', or labor organization, the types of games are limited to bingo, pull tabs, and raffles, whether or not electronic, computerized, or technologically assisted or simulated, and any device used in the conduct of such games may not dispense cash. Where games are conducted by a licensed fraternal, veterans', or labor organization on premises owned by or in sole control of the licensee, the types of games are not so limited, but the games may be conducted only via an electronic, computerized, or other technologic device and, in addition:

● All players must be members of the licensed organization or guests of members;

● All players must be 21 or older;

● The device may not permit the conduct of craps, roulette, or "the lotto-based game of chance commonly known as a slot machine in which a drum or reel with insignia is an essential part";

● The device may not dispense cash; and

● No single bet may exceed $2.00.

The measure delegates to the general assembly the right to limit the number of devices used by a fraternal, veterans', or labor organization to conduct games of chance and prohibits the licensing of any such device to an auxiliary or adjunct group of any such organization. It also authorizes the general assembly to negate, by statute, two existing constitutional limitations on the conduct of games of chance:

● The prohibition on management or operation of a game of chance by a person who is not a bona fide member of the licensed organization hosting the game; and

● The requirement that no person receive any remuneration or profit for participating in the management or operation of a game.

In addition, the proposal would allow licensees to own or lease devices used to play games of chance and to base their payments under leases or maintenance agreements on a percentage of proceeds. It grants to the secretary of state the responsibility to license commercial bingo facilities, manufacturers and suppliers of equipment and supplies used in games of chance, and other persons as directed by the general assembly, as well as changing the law to require the secretary of state to enforce all regulation of games of chance under the constitutional provisions being amended. All necessary legislation would be required to be in place, at the latest, by July 1, 1997.

The fiscal impact of the measure is expected to be significant, although indeterminate. Positive impacts include a possible increase of up to $98,000 per year in license fees received as a result of the increase in the number of organizations that may be eligible to hold licenses, and an indeterminate increase stemming from quarterly report fees based on a percentage of gross proceeds. Negative impacts include an estimated first-year cost of approximately $800,000 to the secretary of state for personnel and other costs of enforcement, and an indeterminate loss of revenue to the state due to competition with the existing limited gaming activity in Central City, Black Hawk, and Cripple Creek and with the state-run lotto and lottery games, assuming that increased bingo-raffle activity will draw customers away from those activities.

## APPENDIX C

Be it Enacted by the People of the State of Colorado:

Article XVIII, Section 2, of the constitution of the state of Colorado is amended to read:

**Section 2. Lotteries prohibited—exceptions.** (1) The general assembly shall have no power to authorize lotteries for any purpose; except that the conducting of such games of chance as provided in subsections (2) to (4) of this section shall be lawful on and after January 1, 1959, and the conducting of state-supervised lotteries pursuant to subsection (7) of this section shall be lawful on and after January 1, 1981.

(2) No game of chance pursuant to this subsection (2) and subsections (3) and (4) of this section shall be conducted by any person, firm, or organization, unless a bingo-raffle license as provided for in this subsection (2) has been issued to the firm or organization conducting such games of chance. The secretary of state shall, upon application therefor on such forms as shall be prescribed by the secretary of state and upon the payment of an annual fee as determined by the general assembly, issue a bingo-raffle license for the conducting of such games of chance to any bona fide chartered branch or lodge or chapter of a national or state organization or to any bona fide religious, charitable, labor, fraternal, educational, voluntary firemen's or veterans' organization which operates without profit to its members and which has been in existence continuously for a period of five years immediately prior to the making of said application for such bingo-raffle license and has had during the entire five year period a dues-paying membership engaged in carrying out the objects of said corporation or organization, such bingo-raffle license to expire at the end of each calendar year in which it was issued.

(3) Subject to the restrictions set forth in subsection (4) of this section, the bingo-raffle license issued by the secretary of state shall authorize and permit the bingo-raffle licensee to conduct games of chance, restricted to the selling of rights to participate and the awarding of prizes in bingo and other lotto-based games of chance, in which prizes are awarded on the basis of designated numbers or symbols on a card or sheet of paper conforming to numbers or symbols selected at random, and in the specific game of chance commonly known as raffles, conducted by the drawing of prizes or by the allotment of prizes by chance. A bingo-raffle licensee may also conduct such games of chance on an electronic, computerized, or technologic device that assists in the playing thereof, and conduct facsimiles of such games of chance in which the numbers or symbols are randomly selected or generated and displayed, by an electronic, computerized or other technologic device.

(4) Such games of chance shall be subject to the following restrictions:

(a) The entire net proceeds of any game shall be exclusively devoted to the lawful purposes of organizations licensed to conduct such games.

(b) No person except a bona fide member of any bingo-raffle licensee may participate in the management or operation of any such game except as may be provided by the general assembly.

(c) No person may receive any remuneration or profit for participating in the management or operation of any such game except as may be provided by the general assembly.

(d) Except as provided for in paragraph (e) of this subsection, only the lotto-based games of chance known as bingo, pull tabs and raffles may be conducted by a bingo-raffle licensee at a licensed commercial bingo facility, on premises owned by or in sole control of a bingo-raffle licensee, or at such other location as approved by the secretary of state. If an electronic, computerized or other technologic device is used to assist in the playing of such games of chance, or to conduct facsimiles thereof, the device may not dispense cash.

(e) In addition, a bingo-raffle licensed fraternal, veterans', or labor organization may also conduct other lotto-based games of chance on private premises owned by or in sole control of such licensee, but only when an electronic, computerized or technologic device is used in the conduct of such other lotto-based game of chance, the playing of such device is limited to members of the bingo-raffle licensee and their bona fide guests all of whom are at least twenty one

years of age, the device does not permit the conduct of the lotto-based games of chance commonly known as a slot machine in which a drum or reel with insignia is an essential part, craps, or roulette, the device does not dispense cash, and no single wager exceeds two dollars.

(f) The number of electronic, computerized or technologic devices used in the conduct of such other lotto-based games of chance conducted by a bingo-raffle licensed fraternal, veterans', or labor organization shall be determined by the general assembly. No device shall be licensed for an auxiliary or adjunct group of any such bingo-raffle licensee.

(g) Any electronic, computerized or technologic device used in the conduct of any lotto-based games of chance may be owned or maintenance agreements. Compensation for said lease or maintenance agreements may leased by the bingo-raffle licensee or licensed commercial bingo facility and such licensees may also enter into service be based on a percentage of the proceeds remaining after payments to players, or upon such other terms and conditions as to which the parties agree.

(5) The general assembly shall enact such laws as are necessary to implement the provisions of this section as adopted at the 1996 general election, and until the effective date of such laws, which shall not be later than July 1, 1997, the current provisions of this section, any statute enacted thereunder, or rule promulgated pursuant thereto, shall remain in full force and effect, and any pending investigation into an alleged violation of statute or rule, administrative hearing, or judicial proceeding, shall be determined pursuant to then applicable law.

(6) In addition to the licensing of bingo-raffle licensees, the secretary of state shall be responsible for licensing commercial bingo facilities, manufacturers and suppliers of equipment and supplies used in bingo, raffles, and other lotto based games of chance, and such other persons as directed by the general assembly. The secretary of state shall also be responsible for the enforcement of subsections (2) through (4) of this section.

(7) Any provision of this constitution to the contrary notwithstanding, the general assembly may establish a state supervised lottery. Unless otherwise provided by statute, all proceeds from the lottery, after deduction of prizes and expenses, shall be allocated to the conservation trust fund of the state for distribution to municipalities and counties for park, recreation, and open space purposes.

## APPENDIX D

### Proposed Initiative on "Bingo— Raffle Licensees (II)"

The title as designated and fixed by the Board is as follows:

AN AMENDMENT TO THE COLORADO CONSTITUTION CONCERNING GAMES OF CHANCE CONDUCTED BY A BONA FIDE CHARITABLE OR NONPROFIT ORGANIZATION, AND, IN CONNECTION THEREWITH, EXPANDING THE VARIETY OF GAMES PERMITTED; ALLOWING THE USE OF ELECTRONIC, COMPUTERIZED, OR OTHER TECHNOLOGIC DEVICES TO PLAY GAMES OF CHANCE OR SIMULATE THE PLAYING OF GAMES OF CHANCE, BUT NOT INCLUDING SLOT MACHINES THAT HAVE A DRUM OR REEL WITH INSIGNIA AS AN ESSENTIAL PART WHICH DISPENSE CASH; ALLOWING THE GENERAL ASSEMBLY TO MAKE EXCEPTIONS TO THE CURRENT PROHIBITION ON THE CONDUCT OF GAMES OF CHANCE BY PERSONS NOT BONA FIDE MEMBERS OF THE LICENSED ORGANIZATION; ALLOWING THE GENERAL ASSEMBLY TO MAKE EXCEPTIONS TO THE CURRENT PROHIBITION ON THE CONDUCT OF GAMES OF CHANCE BY PERSONS WHO RECEIVE REMUNERATION OR PROFIT FOR MANAGING OR OPERATING SUCH GAMES; CHANGING LIMITATIONS ON WHERE GAMES OF CHANCE MAY BE CONDUCTED; ALLOWING LICENSEES TO OWN OR LEASE DEVICES USED TO PLAY GAMES OF CHANCE AND TO BASE

THEIR PAYMENTS UNDER LEASES OR MAINTENANCE AGREEMENTS ON A PERCENTAGE OF PROCEEDS; EMPOWERING THE SECRETARY OF STATE TO LICENSE COMMERCIAL BINGO FACILITIES, MANUFACTURERS AND SUPPLIERS OF EQUIPMENT AND SUPPLIES USED IN GAMES OF CHANCE, AND OTHER PERSONS AS DIRECTED BY THE GENERAL ASSEMBLY; MAKING THE SECRETARY OF STATE RESPONSIBLE FOR ENFORCEMENT OF ALL REGULATION OF GAMES OF CHANCE UNDER ARTICLE XVIII, SECTION 2 OF THE STATE CONSTITUTION; AND REQUIRING THE ENACTMENT OF ALL NECESSARY LAWS BY JULY 1, 1997.

The ballot title and submission clause as designated and fixed by the Board is as follows:

SHALL THERE BE AN AMENDMENT TO THE COLORADO CONSTITUTION CONCERNING GAMES OF CHANCE CONDUCTED BY A BONA FIDE CHARITABLE OR NONPROFIT ORGANIZATION, AND, IN CONNECTION THEREWITH, EXPANDING THE VARIETY OF GAMES PERMITTED; ALLOWING THE USE OF ELECTRONIC, COMPUTERIZED, OR

OTHER TECHNOLOGIC DEVICES TO PLAY GAMES OF CHANCE OR SIMULATE THE PLAYING OF GAMES OF CHANCE, BUT NOT INCLUDING SLOT MACHINES THAT HAVE A DRUM OR REEL WITH INSIGNIA AS AN ESSENTIAL PART WHICH DISPENSE CASH; ALLOWING THE GENERAL ASSEMBLY TO MAKE EXCEPTIONS TO THE CURRENT PROHIBITION ON THE CONDUCT OF GAMES OF CHANCE BY PERSONS NOT BONA FIDE MEMBERS OF THE LICENSED ORGANIZATION; ALLOWING THE GENERAL ASSEMBLY TO MAKE EXCEPTIONS TO THE CURRENT PROHIBITION ON THE CONDUCT OF GAMES OF CHANCE BY PERSONS WHO RECEIVE REMUNERATION OR PROFIT FOR MANAGING OR OPERATING SUCH GAMES; CHANGING LIMITATIONS ON WHERE GAMES OF CHANCE MAY BE CONDUCTED; ALLOWING LICENSEES TO OWN OR LEASE DEVICES USED TO PLAY GAMES OF CHANCE AND TO BASE THEIR PAYMENTS UNDER LEASES OR MAINTENANCE AGREEMENTS ON A PERCENTAGE OF PROCEEDS; EMPOWERING THE SECRETARY OF STATE TO LICENSE COMMERCIAL BINGO FACILITIES, MANUFACTURERS AND SUPPLIERS OF EQUIPMENT AND SUPPLIES USED IN GAMES OF CHANCE, AND OTHER PERSONS AS DIRECTED BY THE GENERAL ASSEMBLY; MAKING THE SECRETARY OF STATE RESPONSIBLE FOR ENFORCEMENT OF ALL REGULATION OF GAMES OF CHANCE UNDER ARTICLE XVIII, SECTION 2 OF THE STATE CONSTITUTION; AND REQUIRING THE ENACTMENT OF ALL NECESSARY LAWS BY JULY 1, 1997?

The summary prepared by the Board is as follows:

The proposal expands the variety of allowable games to include any "lotto-based game of chance," including lotto, bingo, pull tabs, and raffles. It allows the use of "electronic, computerized, or other technologic devices" to play games of chance or simulate the playing of games of chance through the use of randomly selected or generated numbers or symbols, but not including slot machines that have a drum or reel with insignia as an essential part which dispense cash. Where games are conducted on premises not owned by or in the sole control of a licensed fraternal, veterans', or labor organization, the types of games are limited to bingo, pull tabs, and raffles, whether or not electronic, computerized, or technologically assisted or simulated, and any device used in the conduct of such games may not dispense cash. Where games are conducted by a licensed fraternal, veterans', or labor organization on premises owned by or in sole control of the licensee, the types of games are not so limited, but the games may be conducted only via an electronic, computerized, or other technologic device and, in addition:

- All players must be members of the licensed organization or guests of members;
- All players must be 21 or older;
- The device may not permit the conduct of craps, roulette, or "the lotto-based game of chance commonly known as a slot machine in which a drum or reel with insignia is an essential part";
- The device may not dispense cash; and
- No single bet may exceed $2.00.

The measure delegates to the general assembly the right to limit the number of devices used by a fraternal, veterans', or labor organization to conduct games of chance and prohibits the licensing of any such device to an auxiliary or adjunct group of any such organization. It also authorizes the general assembly to negate, by statute, two existing constitutional limitations on the conduct of games of chance:

- The prohibition on management or operation of a game of chance by a person who is not a bona fide member of the licensed organization hosting the game; and
- The requirement that no person receive any remuneration or profit for participating in the management or operation of a game.

In addition, the proposal would allow licensees to own or lease devices used to play games of chance and to base their payments under leases or maintenance agreements on a percentage of proceeds. It grants to the secretary of state the responsibility to license commercial bingo facilities, manufacturers and suppliers of equipment and supplies used in games of chance, and other persons as directed by the general assembly, as well as changing the law to require the secretary of state to enforce all regulation of games of chance under the constitutional provisions being amended. All necessary legislation would be required to be in place, at the latest, by July 1, 1997.

The fiscal impact of the measure is expected to be significant, although indeterminate. Positive impacts include a possible increase of up to $98,000 per year in license fees received as a result of the increase in the number of organizations that may be eligible to hold licenses, and an indeterminate increase stemming from quarterly report fees based on a percentage of gross proceeds. Negative impacts include an estimated first-year cost of approximately $800,000 to the secretary of state for personnel and other costs of enforcement, and an indeterminate loss of revenue to the state due to competition with the existing limited gaming activity in Central City, Black Hawk, and Cripple Creek and with the state-run lotto and lottery games, assuming that increased bingo-raffle activity will draw customers away from those activities.